I would like to reserve five minutes. May it please the court, Adam Carter on behalf of the petitioner, Mark Sadler. Let me begin with the finding of continued insubordination if I might. Whether in August of 2013, Mr. Sadler was being punished on his removal for the exact same thing as his four day suspension weeks earlier. When Mr. Sadler is back from his suspension, he's asked by his boss, Mr. Stringham, for his status with respect to the tasking that was the subject of the prior suspension. And my client's accurate, prompt response of, quote, no change is not a refusal of anything. It's not. It's just a response to Mr. Stringham's email. What's the status? He says no change. It's not separate or new or a distinct order. Well, it's a continuation of refusal to perform the work, right? But, Your Honor, contrast that with this court's affirmance in Bowen where there's, you know, use the government credit card for this charge. The guy doesn't do it. And then use the government credit card for a different charge and the guy doesn't do it. That's different. Here, there's a problem with the prior order that has not been resolved. And the question to my client is, you know, what's the status? And my client says no change. So this finding of continued insubordination is in contrast to this court's holdings in Nguyen and others. The note, the notice for removal says that my client stated there was no change in his assigned task status. He does say that he was just answering that question. But then it goes on to say, which indicates a continued refusal to comply with my directive. There was no reassertion of the directive. There was no clarification of the directive. There was no new directive. So that's the point that I'd like to have this court focused on. You think he misunderstood when they kept asking him, are you doing any work on this project, that they wanted him to keep doing work on the project? No, I don't think it's a misunderstanding. I think it's simply, I have for eight months now been saying that I'm not clear on what it is that I am to do. And they keep going back and telling him you need to do this and he doesn't do it. Yes, but he is doing that because he's refusing to do what he thinks is possibly illegal. And so when he's seeking clarification, his boss, Mr. Stringham, says you are justified in doing that, but then they never answer him. And so our argument on this point is that he ought not to be removed from federal service. He's had a distinguished career. Removed from federal service because there wasn't a separate order in this case. Just a second to the no change point, which is you leave your argument with so you feel that it's quite important. What's our standard of review? What test do we use to decide whether no change was an indication of a continuing insubordination or not? Well, this is, I lead with it because it's de novo, as is our second and third arguments are de novo Why is this de novo? I'm saying the standard of review of this court is de novo because it's being done as a matter of law. That the MSPB, this is CAR Factor 1, the MSPB found that my client, or rather that the Army had proved by clear and convincing evidence on CAR Factor 1, I'm making the argument that that's not the case. You think we have de novo review of that? Yes. What authority do you have for that? Those are factual findings. Whether the agency met its burden by clear and convincing evidence is a factual finding. We review that for substantial evidence. You do review it for substantial evidence. I'm making the point that whether or not this is continued insubordination or not, whether or not it's a lawful order, those are legal determinations that the court can do by de novo review. And I cite that, I cite those cases in my papers. The third issue, I beg your pardon? De novo review of this particular issue? De novo review of this particular issue, whether it's continued insubordination or not. Just help me out in your brief where the cases are cited. I will, I'll find that at the break and come back and answer your Honor's question. You don't know in your own brief where you cited the argument you're making to us? I'm just saying, your Honor, I can take the time now to find it. I don't have it at my fingertips. It's in, it starts on page 27 of our brief. And, if I, I'll find it within that section in a moment. Let me move in the interest of time to the other issue, which I also believe is de novo review, which is whether or not Mr. Sadler's March 2013 complaint to the OSC is protected activity under the WPA. Because he's complaining about his boss changing his duties down to one duty. And he complains to the, to the head of Dudway that, that this is taking, you know, this is taking him off of what was a 2009 ETC policy directive. That is a rule of regulation for purposes of the WPA. Our argument is that the language of. What directive are you talking about? This is the directive that is the 2009 policy directive that made, that made Mr. Sadler's job come to be at Dudway. To do. How is telling him to do this work contrary to that policy? No. The new order from Mr. Stringham in the fall of 2012 was having him do, come up with a testing plan to work with contractors. That was very, very different than, than his, than his job. It's illegal because it's contrary to the job description, is the theory? It's, it's a, it's a fundamental change in his job description, which Mr. Stringham did not have the authority to, to change by fiat. To say you must work with the contractors to test this software when this, than when his job description was to manage the software testing and says nothing about working with or overseeing contractors. What specifically prohibits a supervisor from reassigning an employee duties if, if they think that their work needs to be done differently, if their old work is no longer necessary? Well, the, first of all, they, they have, a supervisor has the ability to change job, job duties and job description, but that has to be done, you have to go through channels to change those things. Here. Where does it say that? Well. Where does it say it is prohibited from assigning an employee duties that are not in their job description? I concede. Without formally changing the job description. No, I concede that this, that this job description does say and other duties as assigned. Of course it does. Because they all do. Yes. So why is that an illegal order? No, here's what's illegal. What's illegal is parroting, paring down the guy's job to only do one thing. And do one thing that is already being done by the contractor. Can you move to the affiliation argument? Because that seems like the only place where you have any real argument on this case. Happy to move there. The standard of review there is abuse of discretion. Mr. Sadler should prevail on that because the timeline is so clear. The Army was required to preserve evidence. They knew about Mr. Sadler's complaint in the summer of 2013. He makes his appeal to the MSTB. He gives them a document request in July of 2013. He's then suspended in August of 2013. He appeals that, brings a new OSC complaint. So it's very clear that all the decision makers here, summer of 2013, know that he is, that they are in litigation. Mr. Carter, I'm looking at what I believe was the first whistleblower complaint. Do you have the record here? It's March of 2013. Do you have the record, page 2102? Yes, I'm there. Yes, sir. So this talked about being given something contrary to his job description. I don't see that complaint anywhere in the first disclosure. Can you point that out to me? Oh, what I was referring to is his e-mail to Colonel Estes, which is the patron. We may try to decide whether or not the first complaint satisfies the legal test for a whistleblower complaint, right? It's a de novo review. And we looked at the document, right? Yes. And that would be the e-mail that you would look at would be page 1124 to 1134. The document is the complaint he lodged, correct? To the OSC? Yes. That is he did that pro se, Your Honor, but it's the – I'm just asking you, isn't that the thing we're testing? That's the thing you – We're testing the document that he supplied to see whether that was sufficient to trigger that agency to go forward. That document is what he submitted to OSC. That is not the underlying complaint. His underlying complaint is to Colonel Estes, which is at page – I understand what you're saying, but I thought when I was – maybe I'm wrong. I thought my way of judging de novo whether your client's first complaint satisfies the test, I look at the complaint. I don't look at some mail, something he did before. It's what did he put in the complaint. I think you and I are getting caught up on the semantics of his complaint to OSC is not his underlying complaint. It's his statement of what he complained about to his boss. What he complained about to his third-level boss, Colonel Estes, appears at page 1124 to 1135 of the record. That's the underlying complaint. I'd like to reserve the rest of my time but come back to Judge Hughes's question about sanctions. I believe that it is the timeline, the very, very clear timeline that showed that the administrative judge here abused his discretion in not finding there to be a culpable state of mind, at least negligence, that would have given an adverse inference that would have changed the result here. Okay. We'll save the rest of your time. Ms. Welch. MS.  Good afternoon, Your Honors, and may it please the Court. I wanted to start specifically on this. On this spoliation question, in Kirkendall we applied a standard where you could have spoliation sanctions as a result of negligence. The new federal rule doesn't allow that. So he seems to be arguing that we have to judge this under the Kirkendall standard. And what's the answer to that question? Your Honor, we don't have to judge this under the Kirkendall standard because negligence in Kirkendall negligence can be a basis for an adverse inference. Kirkendall doesn't lay out a bright-line rule saying any time negligence occurs, an adverse inference has to be drawn. What the issue is here is Mr. Souther's essentially right. I don't read the Board here as saying that there was no negligence. Oh, no, the Board did indeed find there was negligence. The Board found there was negligence. The Board found that the Army failed to, that there was a duty to preserve. Okay, so under the Kirkendall standard, why isn't that ground for a spoliation sanction? Because it's not a per se test. Just because there was negligence found, it doesn't mean that an adverse sanction for the negligence is required. Because this is a highly discretionary decision that the Administrative Judge made, and the Administrative Judge looked at all of the facts and the evidence, and the Administrative Judge considered, in fact, the Army did proceed incorrectly in deleting this PST file, but it determined after looking at all of the evidence and all of the argument, including hearing in which the subject of the deleted e-mails, Colonel Estes was able to testify, the Administrative Judge looked at all that information and found that there was no reason to sanction specifically because it was part of a business practice. I find that A.J.'s decision confusing and fuzzy, but is your point that A.J. found that it was negligent of the agency not to maintain these records because they were on notice that they should have, but there was no culpable intent because of the business practice? Yes, Your Honor, yes. Well, that's a problem because under Kirkendall, you can sanction people for negligence, but not under the new federal rule, so he seems to have been adopting the standard of the new federal rule over the standard of Kirkendall. I don't think that Kirkendall draws a bright line. I think that Kirkendall says that negligence can be a basis. I don't read it as drawing a bright line where if there is negligence – Yeah, but if he says, I'm not going to find sanctions here because I conclude that there was no culpable conduct, then maybe he's not applying the right standard. What exactly did he say? Your Honor, what exactly the judge said was he relied on the new rule 37, but he didn't use it as a binding rule. He just said it was instructive. That was on the rehearing part, right? Yes, Your Honor, that was on reconsideration at pages 21 to 23 of the patent. What did he say in the original? In the original decision, he denied the motion specifically because of the fact that the regular business practice weakened the inference that the file was destroyed knowingly or negligently. The problem here is the board's precedent that we confirmed in Kirkendall that says negligence alone is sufficient. He seems to have both found negligence but then not found negligence at the same time. How do we know which one he was relying on? If he said, I can't do an adverse inference even though there's negligence, then that's inconsistent with Kirkendall, isn't it? Even if we assume Kirkendall doesn't – I mean, I don't think – I wouldn't read Kirkendall as automatically requiring an adverse inference in every instance of negligence. Maybe that is one way to read it. But even if that's not the way to read it, that there's still some discretion, he's still misreading Kirkendall if he said negligence is insufficient to support an adverse inference. Now, where does he say, under the Kirkendall standard, I still wouldn't impose sanctions? I don't believe he said specifically that there's negligence. I might have misspoken earlier in terms of the regular business practice weakened the inference that the file was destroyed knowingly or negligently. So while he did reprimand the Army for the deletion, I don't believe he specifically found negligence. But I think he did actually use those words to describe the conduct. This is the problem. It's a very unclear decision where he finds both negligence for the destruction of the PST files, but on the other hand, because it's a business practice, it's somehow not meant for that. Those two findings are inconsistent with each other, aren't they? I don't believe they're inconsistent, Your Honor. I believe that the judge didn't just consider the fact that it was a business practice, but the judge also considered the hearing and the testimony that was put forth by Colonel Estes and what he heard and the fact that Mr. Sadler was able to cross-examine and talk to the players in this case and hear what they had to say about what the contents was of this PST file. So not only was it based on this business, inference related to business records, but he was able to just, the administrative judge was able to test as well the facts of the case and test whether or not it seemed like the circumstances implied something was done knowingly. Could you show us the pages of which he makes these rulings, both of the original decision and the reconsideration? The original decision is at 2439 in the appendix. That's the administrative judge's order. 2439? 2439, Your Honor. 2439. That's the motion, that's the delaying motion for sanctions. Yes, that's the original order. Yes, that's the original order. And besides Kirkendall? Yes. The administrative judge has Kirkendall. And that doesn't refer to the new rule? No, because this was before the new rule. Okay. This decision came out, I believe, in 2017. Which volume were we in? 2439 in volume two? 2439 in volume two, and actually it's 2440 where Kirkendall is cited and where the judge is just talking about the standards in the case resolution. And here the judge found that the PSC file, while the agency was obligated to preserve, but because there was a standard operating procedure of deletion, and the board specifically had a discretion to fashion appropriate sanctions. I think that's where this lies here, is the board had discretion to sanction. There's nothing in the law, there's nothing in the case law, there's nothing in Kirkendall. There's clear recognition of Kirkendall on 2440, right? Yes. And that's really all there is to that, right? Yes, Your Honor. Does he make a finding here that the agency was negligent? It breached its duty. Excuse me? Your Honor, the administrative judge says on 2441 that the agency breached its duty after failing to take standard precautions. However, in the very next paragraph, the judge said that because it was part of a regular business practice, it weakened the inference that the evidence was destroyed knowingly or negligently. So it was your view that the conclusion that it breached its duty is not a finding of negligence. It's just a recognition that it breached its duty. And then the next paragraph says, but this doesn't rise to the level of negligence. Yes, Your Honor. Even though it's worded very weakly about weakening inference, that it was destroyed knowingly. Yes, Your Honor. As I said, I did misspeak earlier about negligence. But there's a problem here. Look at 2440. He says, a party seeking adverse inference for spoliation must establish, the record was destroyed with a culpable state of mind.   With a culpable state of mind. That's not right, right? Well, that's heading B, then. Why are we relying on Sixth Circuit law in this case? I know you didn't do this below. But that, the Sixth Circuit law requires a culpable state of mind, as do almost every other circuit for spoliation, which is also, I think, supported by the federal rules. But we're bound by Kirkendall, which suggests that, and not Kirkendall, but by the board's adoption of a rule that allows negligence. I think that I would again point to the fact that it can justify an adverse inference in Kirkendall. It's not, requires an adverse inference. I think it's very hard to read this decision as an indication that the administrative judge actually understands the standard to be applied in this case. Because he's quoting Gieben, which is not the law for our circuit. And the culpable state of mind, which maybe should be the rule. And Kirkendall, which is binding on us, and that says negligence is enough. And then has two paragraphs that suggest, well, there's a breach of a duty, which has to be read as at least negligent. But then it's not negligent. Do you think the reconsideration decision helps clear this up, Penny? I didn't read it as much better. The reconsideration decision broadens. It doesn't just focus on... It's the one that looks at the federal rules and says this helps inform us. But the problem is, the federal rules caution it. I mean, I think assume at least gross negligence or some culpable state of mind. Because the Federal Rule 37 rejects an adverse inference just based on negligence and requires proportionality. And I believe that in the reconsideration decision, the judge... Where's that? That is at page 21 and 23 of the appendix, which would be volume one. That's the reconsideration decision? Yes. Well, that's the initial decision. And then the reconsideration decision just affirms the initial decision. It would be. The page is 21 for the initial one. 21 in your record? Yes. I mean, the problem here is that the appellate was arguing the wrong wall, too, because it notes that he cited Second Circuit Law and Sixth Circuit Law again, which does require a culpable state of mind. So I don't necessarily blame the A.J. for all of this confusion, because there's a bunch of... But it's very unclear as to whether the A.J. was applying the Kirkendall standard. Well, the A.J. does cite MSPB rulings. They're pre-Kirkendall, but the agency is relying on MSPB precedent. So the A.J., when they say on page 22, I do not find the appellant's arguments persuasive and decline to exercise discretion, there's a citation to Hidalgo and Navidad. And then next, relying on the Federal Rule of Civil Procedure 37. Do you read Kirkendall as us saying that negligence is sufficient or that we're just saying the Board found it in that other case and we're going to hold them to it? Yes. Does that mean the Board could adopt a new rule that would be consistent with almost every other circuit and require at least gross negligence or culpable state of mind and still be consistent with Kirkendall? I believe that, in terms of what they could adopt, well, Kirkendall, again, I keep coming back to, Kirkendall doesn't say that negligence is required. I understand, but it also specifically relies on the Board's case. Yes. I don't think it. De Novo says that negligence is always enough to automatically draw an adverse inference. It just says the Board's adopted this rule and they're bound by it if they continue to apply it. But does the fact that we affirm that rule mean that they're prohibited from reassessing that rule if they decide they'd rather be consistent with almost every other circuit? I don't see how that would prohibit them. I don't think Kirkendall would prohibit them from deciding to change the rule, Your Honor. Who makes the rules? Do they make this rule or is it up to us to determine what the appropriate rule is? No, it would be up to Your Honor, this Court. So if we determine that the better, but we didn't actually, let's just assume that my reading of Kirkendall is right, there may be disagreement about this, but that we didn't ourselves say negligence is sufficient, but just that the Board had said we were going to follow the Board's practice there in that specific case, are we free to say that, as a matter of law, negligence isn't enough and bring it in line with the rest of the circuits in this case? Yes, Your Honor. Do we have to go on bond to overrule Kirkendall to do that? No, because the way, at least I understand, and you and I are both reading Kirkendall in this instance, is that it's a can. It's not a must. So I don't think if here, in this case, if it's... Well, it's because Kirkendall didn't reach the question of what rule we want to adopt. Right, and because Kirkendall didn't reach the reason, that would be another reason you would have to go on bond, because you wouldn't be overruling Kirkendall because it didn't reach, specifically, the decision. It didn't reach the issue. Okay. I think we're out of time. Thank you, Ms. Welch. Mr. Carter, you have a little time for rebuttal here. I've been practicing law long enough to know I don't want to talk, Your Honor, out of anything. But there was one fact that I thought might help Your Honor's decision on this, and that is that, and I'm not, in the reconsideration, sorry, in the decision on sanctions, which is in the appendix at page 2441. Note that there were two things that were... In the reconsideration decision? Sorry, not the reconsideration. The original order on sanctions. He said that there was a PST file on the laptop. There was, he said, also, probably on an external drive. So there's two things of destruction, and that, again, suggests to me that there, he's finding that there's at least negligence here. The question of... Did you ask Colonel Estes about any of these e-mails when you crossed him? Your Honor, I wasn't under counsel below. Well, I know, but you're bound by everything that happened below. Of course. Why didn't you try to preserve a record about whether these e-mails were relevant or not? I mean, you have the decision maker, and I think you had a bunch of other people that these e-mails were sent to in front of the board, so you could have probed what they thought these e-mails said and got that information another potentially relevant way. If Your Honor, please, the decision on this came out before the hearing, and so the judge had already ruled. Again, I wasn't trial counsel, but... So what? I mean, make your record about and ask for reconsideration again or appeal it. Reconsideration a second time? I usually get castigated by judges once I... Then make a record for appeal. If you ask this guy what was in the e-mails and he's evasive or seems to be lying, then the board's going to note that and they might change their mind, or you might have a record for us. This would be a much easier case for you if you tried to do that, or if he wasn't available to testify, because the fact that he's deleted e-mails, a bunch of e-mails, which seems like automatically happens when he moves on to a new command, doesn't necessarily say he was intentionally destroying e-mails. You don't know what was in them. That's right. But what we do know is that there's a massive gap from January of 2013 to July of 2013 that is belied by all of the... in contrast to what Dr. Green maintained and had hundreds of e-mails with respect to Sadler in his cache. So clearly when in January of 2013... Did Dr. Green leave? Dr. Green was my client's prior supervisor, so his information came at the FOIA request. But the point is that all of the five decision makers in this case deal with Sadler, admit that they are dealing with Sadler, discussing Sadler, and there are 11 e-mails that don't shed any light on the rationale for why they're disciplining Sadler. So there's clearly a disruption. Before you sit down, one more question. Did you or a prior counsel argue to the administrative judge that the Sixth Circuit was... that Bevin's standard applies, the culpability standard applies, or did counsel argue for the Kirkendall standard? I don't know the answer to that, but let me just say, I think the culpable state of mind line comes from the Southern District of New York, Zubulake, which is the seminal decision on the standard for spoliation. But the law has progressed since then, and the Sixth Circuit... But the question is what you argued or what your counsel argued. I mean, the board says in its decision that you argued Bevin to them. Is there any reason to think that that's incorrect? No, but the gloss that was being used was Bevin was responding on Juice Burns, and Juice Burns was a situation where they didn't even know about the underlying litigation. So we distinguish that in our brief, I think, rightly. Okay. Thank you, Your Honor. We're out of time. Thank you. That concludes our sessions for this morning.